No. 22,030.

ANDREW M. DAVIS, as Administrator, etc., et al., *Appellees*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Death of Brakeman—Evidence for the Jury*. In an action where it is claimed that the death of a brakeman was caused by the defective condition of the machinery used to operate a dump car, the evidence is held sufficient to take the question of negligence to the jury.

2. SAME—*Contradictory Statements of Witness—Demurrer to Evidence Properly Overruled*. Where the question at issue is whether an accident was caused by a conceded defect in machinery, the court is not justified in sustaining a demurrer to the evidence merely because plaintiffs' witness makes contradictory statements of the material facts, nor because the witness, who is an experienced engineer, testifies that, in his opinion, the accident could not have been caused by the defect.

Davis v. Railway Co.

3. SAME—*Finding—Negligence against Defendant.* The finding that it was the conductor's negligence that caused the accident, is construed as a finding of negligence against the defendant.

Appeal from Montgomery district court; JOSEPH W. HOL-DREN, judge. Opinion filed April 12, 1919. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*Walter L. McVey,* of Independence, *T. R. Evans,* and *H. P. Farrelly,* both of Chanute, for the appellees.

The opinion of the court was delivered by

PORTER, J.: The parents of Harry Davis, who was killed while in the employ of the defendant, recovered judgment for the loss of his services. The defendant appeals.

The deceased was a brakeman, in his twenty-first year, and had been employed by defendant but a short time. On September 30, 1915, he was assisting in unloading a dump car filled with dirt. The car was operated by air power, and when in its normal working order the floor of the car dipped down on one side and up on the other, and the two sections of the floor were chained to the sides. When it was loaded, and one side was unchained, the part of the floor on that side would go down by gravity, and the other part would go up, so that the dirt would slide out, while the sides would remain nearly stationary. It was alleged in the petition that the floor of the car would remain in this slanting position, under normal conditions, until the air was turned on, when the two parts would snap up against the side of the car "with great velocity and force"; that while deceased was standing on the ground shoveling dirt out of the car, without notice or warning, and without the intervention of human agency, the car suddenly snapped up with great force, caught him between the bottom and side of the car, and crushed him across the upper chest, neck, and the back of his head, and so injured him that he died almost immediately. It was alleged that the car and the air power upon it were defective and out of order; and that it was negligence to permit the car to stand in the rain and become wet and muddy; and, further, that the plaintiffs were not familiar with the mechanism of the dump car and air-brake equipment, and

were unable to more particularly set out the workings thereof and the defects therein, because the car was wholly within the control of the defendant, but that defendant had full knowledge of the defects and conditions.

The answer, besides a general denial, pleaded contributory negligence, assumed risk, and alleged that the defendant and the deceased were engaged in interstate commerce at the time of his death.

There was a demurrer to plaintiffs' evidence, which was overruled. Defendant elected to stand upon its demurrer and offered no evidence, but requested a directed verdict in its favor, which was refused.

With the general verdict, the jury returned the following special findings:

"Q. 1. Did the deceased, Harry Davis, at and immediately prior to the time car No. 185908 was attempted to be dumped, know that the dirt therein was wet and sticky? A. Yes.

"Q. 2. Do you find, from the evidence, that one of the air valves on one of the cylinders of car No. 185908 was gone at and prior to the time of the accident? A. Yes.

"Q. 3. If you answer the last question 'yes,' how long prior to the accident had it been gone? A. 4 days.

"Q. 4. If you answer question No. 2 'yes,' did the deceased, Harry Davis, at and just prior to the accident know that said valve was gone? A. No.

"Q. 5. Was the deceased, Harry Davis, guilty of negligence, contributing to the accident? A. No.

"Q. 6. If you find for the plaintiff, and further find that the said Harry Davis was guilty of contributory negligence, then state how much you deduct on account of such contributory negligence. A. . . .

"Q. 7. If you find for the plaintiff in this action, how much do you allow to Andrew M. Davis, on account of the pecuniary loss resulting to him from the death of the said Harry Davis? A. Stricken out by the court.

"Q. 8. If you find for the plaintiff, how much do you allow Emma C. Davis for the pecuniary loss resulting to her from the death of the said Harry Davis? A. Stricken out by the court.

"Q. 9. If you find for the plaintiff, in what respect do you find the defendant, its officers, agents or employees, negligent? A. Conductor's negligence."

The contention is that the demurrer to the evidence should have been sustained because no negligence was proved against the defendant. In the defendant's brief there are six or seven pages taken from the testimony of Mr. Wareheim, engineer of

the train, who was sitting in his cab watching the work, and who was the only eyewitness of the accident.

The engineer testified that on the car in question one of the valves used to release the air was missing, and that a plug made of cast iron about an inch long was used to take the place of the valve; that he and the conductor, Craig, talked two or three times in the yards, before the accident, about this defect, and the witness proposed to the conductor that the latter should order valves for the four cars which were in the same condition, and that if the conductor could not get them, the witness would draw them when he got to Chanute; that "we talked about it on Monday the day before the accident, and on Saturday afterwards. . . . I made a remark that we ought to get something to put in the place of those plugs, I think we said four, there were only four that were broken out. . . . I. had known that those valves were gone, first time we dumped the cars found it out; that was about ten days before Davis was hurt. . . . The only way we had to handle them was with plugs." He testified, also, that a few days after Davis was killed, they put a valve on the car in question; and further that the cars were so equipped that the air is only used to pull them back to position, to right them, bring them up.

This witness, however, testified that the only reason the valve would be better than a plug was for draining the air out of the cylinder after the car had righted up. Several times, on cross-examination, he stated that in the conversation with conductor Craig about putting valves in the cylinders instead of the plugs, he was "discussing the matter as a matter of convenience and not as a matter of danger or safety; . . . we only just made a remark that it would be a good idea to get valves and put in the place of those plugs to make it convenient for draining the air out of those cylinders, as there had been one or two of the plugs blown out of their fingers and we had to go and hunt them, or go to another car and get a plug, and it was only about their convenience, it was n't about any danger. . . . The plug was safe enough as long as it was in there. . . . If that plug is in there and the valve closes, there is no way for the air to escape out of that cylinder, and there would be pressure against the piston. . . . The plug served the purpose just as well as the valve, except for the convenience of operating. The draining of the cylinder

would n't be assured any more by a valve than a plug, if you take the plug out."

The witness identified his signature to a report of the accident, in which he stated:

"These cars dump and readjust themselves by air from the train line, and all I do after stopping is to leave air-brake valve in running position, which keeps the train line charged, and any manipulation of the air in handling the dump cars is done by the men at the cars and not by me."

In describing the accident he said:

"I did n't see who loosened the chains because that would be done on the opposite side to me. Mr. Craig (the conductor) was up on top of a pile of dirt that was in the car, a little at the south side . . . the road-master was just east of him, about on the same pile of dirt. . . . What I saw was that while those men were working as I have described, the car started to come up and did come up and caught Davis, and that is all I know about how it happened."

In describing the plugs, he testified:

"Those plugs were cast-iron plugs and had some threads on them, and we screwed them in, and the objection to them was that when the employee would screw them out they would blow out of his hand, blow clear out in the field sometimes. . . . We found out that these valves were gone the first time we dumped the cars, which was about ten days before the accident. . . . These plugs had about an inch of thread on them. They were tapered, the further in you screwed them the tighter they got, so as to close up the opening tight. I don't know what caused the car to come up there that day. I don't know where the plug came from that I saw Watson have on the day of the accident. I don't know whether that car came up by reason of something about the air, or the plug, or somebody pushed upon the car."

In defendant's brief, after quoting from the testimony of the engineer, it is said:

"If the cylinder was drained of air, no power or force could be brought to bear to right the bottom of the car. After the bottom of the car was raised to its normal position by the air pressure, the air would be cut off from the train line by closing the angle-cock, and then the cylinder was drained of air by opening the valve or removing the plug used in lieu of the valve. This is made perfectly plain by the testimony of Mr. Wareheim."

We have studied the testimony of this witness with a great deal of care, and we would not go so far as to say that his testimony makes anything very plain, except the fact that he is sure that the failure of himself and the conductor to repair the defect until after Davis was killed had nothing to do with the

accident. The jury were not bound by these statements, although he was the plaintiffs' witness. They may have believed, from his appearance and manner of testifying and what he said as to his own connection with the matter, that he was endeavoring to shift responsibility for the accident from his own shoulders. His testimony shows, beyond any question, that there was a defect in the air mechanism which was regarded by himself and the conductor as of sufficient importance to require repairs before the accident, and which they very promptly caused to be made after Davis was killed.

Presumably, defendant had within its control the particular car and others of the same pattern, and evidence which would have made it easier for a court or jury to understand the facts testified to by the witnesses. The defendant, however, chose to stand upon the claim that there had been no evidence introduced sufficient to make a *prima facie* showing of its negligence.

It may very well be that the lamentable accident was not caused in any respect by the absence of the valve, or the use of the plug in place of a valve. It may be that an examination of the air mechanism of the particular car and others of the same construction, by skilled mechanics, would demonstrate to a jury that these conditions could have had nothing whatever to do with the accident. We do not know; the jury did not know for a certainty. But it must be remembered that the question we have to determine is whether it was error to overrule the demurrer to the evidence, or refuse to direct a verdict in defendant's favor. Aside from one other contention, which will be noticed presently, defendant's sole argument is directed in the brief to the proposition that the court should have given judgment in favor of the defendant because no negligence was shown on the part of the railway company. To a mere layman in the science of mechanics, there appear to be some inconsistent statements in the testimony of the witness Wareheim. He testifies that the air was not used to dump the cars, but was used for the purpose of righting them after they were dumped, and that "if there had been a valve in that cylinder so that it could have been and was open, it would have drained the cylinder, and the air power could not have thrown the bottom of the car up then." But the valve was not in the cylinder, and

39—104 KAN.

there is some slight evidence tending to show that the plug was picked up from the ground by one of the crew after the accident. Besides, an ordinary jury, having heard the same witness attempt to explain that the valve, which he said should have been in place, "was for draining the air out of the cylinder, after the car had righted up" (which would necessarily have been, in this case, after Davis was killed) might be excused for refusing to accept his opinion that the absence of the valve and the use of the plug had nothing to do with the accident; and especially, in view of his statement that with all his experience, he did not know whether or not the accident was caused by the plug. As already observed, the jury were not bound to believe all that he said, if they believed that his testimony indicated a desire to get away from his own moral responsibility for the young man's death. The jury may have been influenced by his testimony as to what occurred just after the accident, when he saw one of the workmen, Watson, holding such a plug in his hand, and the witness remarked to the conductor that he would try to get the valves at the roundhouse at Chanute.

It was held in the case of *Acker v. Norman,* 72 Kan. 586, 84 Pac. 531, that a court is not justified in sustaining a demurrer to the evidence because plaintiff, testifying in his own behalf, makes contradictory statements of the material facts; and that it is the duty of the jury to reconcile, if possible, a conflict in the plaintiff's statements, unless plaintiff has made a statement or admission of some fact which absolutely destroys his right to recover. Certainly, it ought not to be held that a plaintiff is bound to any more stringent rule, where he is, perhaps, compelled to call as a witness one who is either unfriendly, or who, by reason of some personal interest or bias indirectly involved in the matter, states his opinion of a question of fact, which is contrary to the theory upon which plaintiff proceeds. It was for the jury to determine from the entire testimony, and from all the circumstances in evidence, whether the defect in the machinery which operated the dump car was the cause of the accident.

Evidence of repairs or changes made shortly after an accident has been held admissible in a number of Kansas cases. (*Howard v. Osage City,* 89 Kan. 205, 208, 132 Pac. 187, and

cases cited in the opinion.) According to the weight of authority, evidence is not admissible for the purpose of showing either notice, or the fact, of prior negligence. (1 Wigmore on Evidence, pp. 364, 365.) In the present case, however, the condition at the time of the accident, and before, was shown by other and direct evidence; and in any view of the rule to which we have referred, we think the fact that it was repaired soon after the accident was admissible, as a circumstance which the jury might properly consider in connection with the engineer's statement that he was unable to say whether the car came up by reason of something about the air, or the plug.' And for another reason, we think, in any view of the rule, the evidence was competent. The engineer had said repeatedly that when he talked with the conductor about making the repairs before the accident, he was not at all anxious about the danger to the train crew, and that it was only to make it more convenient; but there in the presence of the dead man, as we gather from the evidence, he said, in substance, to the conductor, "I'll attend to that matter now; I'll get those valves fixed." The jury had a right to consider this in connection with his statements that he had not been anxious or worried about any danger connected with the use of a plug where there should have been a valve. We think it cannot be said there was no evidence upon which to submit the case to the jury.

The jury found that it was the conductor's negligence that caused the accident. It is said:

"There is nothing in the evidence tending to connect the conductor with the casualty."

The company's rules were introduced in evidence to show what the duties of the conductor were, and the finding amounts to nothing more than a statement of which particular employee of the company was negligent in failing to have the defective condition of the car repaired before the accident. The conductor in charge of the train was performing the functions of the master, and for his negligence the company is responsible. (*Brick Co. v. Shanks*, 69 Kan. 306, 76 Pac. 856; *Orr v. Construction Co.*, 96 Kan. 713, 716, 153 Pac. 526, and cases cited.)

The judgment is affirmed.